# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND
# SOUTHERN DIVISION

| | | |
|---|---|---|
| GREENBELT VENTURES, LLC, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. AW-10-00157 |
| WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, | * | |
| Defendant. | * | |

******

## MEMORANDUM OPINION

Pending before the Court is Defendant's Motion to Dismiss (Doc. No. 18) the Plaintiff's seven-count claim against Defendant arising from an unsuccessful real estate transaction concerning the development of real property at the Greenbelt Metrorail Station in Greenbelt, Maryland. The Court has reviewed the parties' motions and all supporting documents and finds that no hearing is deemed necessary. *See* Local Rule 105.6 (D. Md. 2008). For the reasons articulated below, the Defendant's Motion to Dismiss is GRANTED IN PART and DENIED IN PART.

## FACTUAL BACKGROUND

Defendant, Washington Metropolitan Area Transit Authority ("WMATA"), is charged with the construction and operation of the transit system for the Washington, D.C., metropolitan area and was created by an Interstate Compact ("Compact") between the state of Maryland, the Commonwealth of Virginia, and the District of Columbia. WMATA leases and sells real property that is located at or adjacent to the Metrorail stations that it owns to developers who are interested in creating "transit-oriented development projects" in an effort to "increase transit ridership and provide revenue to help offset the cost of operating transit systems." (Doc. No. 18, 4.) WMATA's Board of Directors has adopted guidelines to assist WMATA staff in its joint

development program, originally entitled the Procurement Procedures Manual ("PPM") and later revised in 2008 as the Joint Development Policies and Guidelines ("JDPG"). Under both versions of the guidelines, the Board of Directors, and not the General Manager or WMATA staff, is responsible for, inter alia, approving the developer selected for a particular Metrorail development project and the terms of contracts with the designated developer. (Doc. No. 18, Ex. 1, 5.); *see also* (Doc. No. 21, Ex. 1.)

WMATA issued a Request for Proposals to develop its property surrounding the Greenbelt Metrorail Station in Greenbelt, Maryland, ("Greenbelt Project") on March 22, 1996. Metroland Developers, LLC ("Metroland"), who was originally a plaintiff in this matter but requested termination from the case, submitted a proposal and the Board approved Metroland as the selected developer for the Greenbelt Project. After approving Metroland as the developer, the Board approved "a detail term sheet containing [the] terms and conditions for development" of the Greenbelt Project on January 27, 2000, which authorized WMATA staff to execute a Joint Development Agreement ("JDA"). WMATA and Metroland entered into the JDA on December 21, 2000, which contained the terms and conditions for the development of a "mixed-use, transit-oriented development project consisting" of "residential property," "retail property," "office property," and a "Hotel/Conference Center." (Doc. No. 18, 6.) The JDA also required Metroland to replace the parking lot owned by WMATA. The closing of the sale was contingent on Metroland satisfying a number of conditions including: preparation and submission of a site plan to appropriate governmental entities, initiation of legislative efforts to obtain funding from the Maryland Consolidated Capital Transportation Program for the design and construction of an interchange from the Capital Beltway to the Project area, obtaining all approvals necessary for the project including zoning and land use, and designing WMATA's new parking lot. The

original term for meeting these pre-closing conditions as allocated in the JDA was five (5) years, with the opportunity to extend the term for an additional year, up to five times, for a maximum of ten (10) years. Without approval from the Board, WMATA and Metroland amended the JDA on October 10, 2002, and provided for an initial term of six (6) years, and then four (4) one-year extension periods, for a total extended term of ten (10) years. Metroland sought and WMATA gave approval for the annual extensions, and Metroland affiliate, Metropark, and later Greenbelt Ventures, LLC, ("Greenbelt Ventures"), the remaining Plaintiff in this matter, made extension payments on Metroland's behalf.

In late 2005, Greenbelt Ventures and Metroland entered into a preliminary agreement for Greenbelt Ventures to purchase a controlling interest in Metroland. Greenbelt Ventures alleges that WMATA was fully aware that it had assisted Metroland in obtaining many of the milestones required under the JDA because of its intended acquisition of Metroland. Under the JDA, Metroland was not permitted to assign the Greenbelt Project contract without WMATA's prior written approval, and the JDA provides that "approval shall not be unreasonably withheld." (First Am. Compl. Ex. A, at § 20.02.) The JDA also states that "in the event that consent or approval is sought but not granted, such a denial shall be accompanied by a statement of the reasons for the denial within fifteen (15) days after such consent or approval is initially requested." (*Id.* at § 21.07.) On March 23, 2006, Greenbelt Ventures submitted its written request for approval of its acquisition of a controlling interest in Metroland and assignment of the Greenbelt Project contract. Greenbelt Ventures contends that from 2006-2008, WMATA orally represented on several occasions that it had already approved the change in ownership of Metroland and that it would provide written approval of Greenbelt Ventures as the developer for the Greenbelt Project. In reliance on these representations, Greenbelt Ventures asserts that it

3

expended time, effort, and financing to continue with the development plans. Moreover, on July 19, 2006, Metroland and Greenbelt Ventures entered into a Membership Interests Purchase and Sale Agreement ("Membership Purchase Agreement") in which the existing Metroland members would retain a 10% interest, Prudential would obtain a 50% interest, and Greenbelt Ventures would obtain a 40% membership interest in Metroland.

WMATA denies making such representations, and in any event, asserts that it never provided written approval of the change to Greenbelt Ventures as the developer for the Greenbelt Project pursuant to its contract with Metroland, which Greenbelt Ventures understood was a condition to assignment of the Project. Instead, on September 1, 2006, Greenbelt Ventures alleges that Elisa Hill, a WMATA staff member, informed Greenbelt Ventures that WMATA had not given written approval and that written approval would be conditioned upon the Board's approval of an amended JDA. According to Greenbelt Ventures, as of September 18, 2006, WMATA requested an increase in the purchase price of the property before it would grant approval of the assignment. Greenbelt Ventures asserts that it made the 2006 extension payment of $76,753.25, and continued to act as the developer for the Project. However, from February 2007 until April 2008, Greenbelt Ventures protested WMATA's unreasonable withholding of approval of the assignment and its new conditions for approval to various officials in WMATA and eventually to Maryland's Lieutenant Governor. Accordingly, WMATA begin negotiating the terms of a proposed amended JDA ("Restated JDA") with both Metroland and Greenbelt Ventures. WMATA argues that all parties had full knowledge that the Board would have to approve the proposed assignment. The parties agreed to a Restated JDA in June 2008, and the Restated JDA was placed on the Board's agenda for consideration at its July 24, 2008, meeting; however, Greenbelt Ventures requested that the proposal be withdrawn and placed on the agenda

for the Board's September 25, 2008, meeting. Meanwhile, a September 15, 2008, *Washington Post* article surfaced, which indicated that the FBI was investigating a former Prince George's County Council member concerning his improper involvement on legislation connected with the Greenbelt Project. Pointing to the negative publicity on the Greenbelt Project, WMATA's Board decided to remove the proposed amended JDA from the September 25, 2008, Board meeting agenda, and has not since sought to place the proposal back on its agenda for consideration despite Greenbelt Ventures requests.

Greenbelt Ventures and Metroland originally brought suit in the Circuit Court of Maryland for Prince George's County, Maryland, to contest WMATA's purportedly unreasonable withholding of approval for the assignment of the JDA from Metroland to Greenbelt Ventures. However, Greenbelt Ventures alleges that after filing litigation, Metroland informed it that Metroland had secretly been meeting with WMATA and the FBI to discuss the potential use of WMATA property located at the Greenbelt Metrorail Station for the relocation of the FBI facilities. Greenbelt Ventures contends that Metroland withdrew from the litigation because of the potential risk that the litigation posed to Metroland's negotiations with WMATA and the FBI. In addition, Metroland sent Greenbelt Ventures a letter terminating the Membership Purchase Agreement, which Greenbelt Ventures disputes whether the letter effectively terminates their contract. WMATA removed the case to this Court on January 21, 2010, on diversity of citizenship grounds.[1] Greenbelt Ventures asserts claims against WMATA for breach of contract, fraud, breach of fiduciary duty, tortious interference with contract, interference with prospective advantage, promissory estoppel, and unjust enrichment. The First

---

[1] Metroland was originally a Plaintiff when this action was filed in state court; however, stipulated to dismissal before WMATA removed the case to this Court. The case caption has been changed to Greenbelt Ventures LLC v. Washington Metropolitan Area Transit Authority to reflect the current parties in the case.

Amended Complaint ("Complaint") seeks declaratory and injunctive relief and specific performance.[2]

## STANDARD OF REVIEW

Defendant asserts that it is entitled to sovereign immunity for all tort and quasi-contract claims, and thus these counts must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of jurisdiction. *Smith v. WMATA*, 290 F.3d 201, 205 (4th Cir. 2002). Plaintiff bears the burden of proving that the court has subject matter jurisdiction over this matter, and the court may consider exhibits outside of the pleadings to "resolve factual disputes concerning jurisdiction." *Id.* at 206. "When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), 'the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" *Evans v. B.F. Perkins Co.,* 166 F.3d 642, 647 (4th Cir.1999) (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. United States,* 945 F.2d 765, 768 (4th Cir.1991)).

In its reply brief, WMATA conceded that sovereign immunity did not bar the breach of contract claim, but asserts that the breach of contract claim should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Generally, a complaint need only satisfy the simplified pleading standard of Rule 8(a), *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002), which requires a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). Nevertheless, the Supreme Court has directed courts that Rule 8 still

---

[2] Plaintiff also asserts a count for Temporary Restraining Order and Preliminary Injunction in its Amended Complaint. However, Plaintiff has not satisfied the standard for obtaining such relief as set forth in the Complaint. Accordingly, the Court will not grant a Temporary Restraining Order or Preliminary Injunction at this time.

requires a showing, of "enough facts to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 n.3 (2007). In its determination, the Court must consider all well-pled allegations in a complaint as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe all factual allegations in the light most favorable to the plaintiff. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999). The Court need not, however, accept unsupported legal allegations, *Revene v. Charles County Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979). In sum, factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact). *Twombly*, 550 U.S. at 555 (citations omitted).

## **ANALYSIS**

**I. Application of Sovereign Immunity**

WMATA is an interstate compact agency that is entitled to sovereign immunity with respect to certain claims. WMATA was created in 1966 by an interstate compact enacted and consented to by Congress and adopted by the state of Maryland, the District of Columbia, and the Commonwealth of Virginia. *Martin v. WMATA*, 667 F.2d 435 (4th Cir. 1981). The signatories of the compact conferred Eleventh Amendment immunity on WMATA. *See Delon Hampton & Assocs. v. WMATA*, 943 F.2d 355, 359 (4th Cir. 1991). An agency of the state shares the same privileges as that of the state, including sovereign immunity. *See Beatty v. WMATA*, 860 F.2d 1117, 1126 (D.C. Cir. 1988). Plaintiff points to § 80 of the Compact to support its position that WMATA has broadly waived its immunity of contract and tort claims arising out WMATA's proprietary, or non-governmental, functions. Section 80 of the Compact provides:

> The Authority shall be liable for its contracts and for its torts and those of its directors, officers, employees, and agents committed in the conduct of any proprietary function, in accordance with the applicable signatory (including rules of conflict of laws), but shall not be liable for any torts occurring in the performance of a governmental function. The exclusive remedy for such breach of contracts and torts for which the Authority shall be liable, as herein provided, shall be by suit against the Authority .
> . . .

Md. Code Ann., Transp. § 10-204(80) (West 2010).

The Fourth Circuit has identified a two-step inquiry into whether a given WMATA activity qualifies for immunity. *James v. WMATA*, 649 F. Supp. 2d 424, 430 (D. Md. 2009). "First, if [WMATA] is engaged in a quintessential governmental function, its activities fall within the scope of its immunity." *Id.* "If [WMATA] is not engaged in such a governmental function, however, a court must proceed to the second inquiry, and it must determine whether the challenged activity is discretionary or ministerial." *Id.* If an activity is discretionary, then "[WMATA] is immune from any claim, 'however negligently caused, that affects the governmental functions.'" *Id.* On the contrary, "sovereign immunity never shields ministerial actions" from liability. *Monument Realty LLC v. WMATA*, 535 F. Supp. 2d 60, 76 (D.D.C. 2008). As reiterated in *Monument*, "generally speaking, a duty is discretionary if it involves enforcement or administration of a mandatory duty at the operational level, even if professional expert evaluation is required." *Id.* (citing *Beatty*, 860 F.2d at 1127). In determining whether an act is discretionary or ministerial the court must first decide whether there is "a statute, regulation, or policy specifically prescrib[ing] a course of action" that WMATA has engaged in. *Id.* If there is no such policy or statute governing WMATA's actions, then WMATA is entitled to exercise discretion to the extent that its decision is grounded in social, economic, or political goals. *Id.* at 76-77. Here, WMATA concedes that the sale of its real estate property is not a quintessential governmental function. Thus, WMATA is only entitled to sovereign immunity of

the Plaintiff's tort claims if the Court finds that its actions were discretionary as opposed to ministerial.

### A. Tort Claims – Fraud, Breach of Fiduciary Duty, Tortious Interference with Contract, Tortious Interference with Future Economic Advantage

Defendant cites two cases addressing WMATA's sovereign immunity to claims similar to the ones asserted by Plaintiffs. In *KiSKA Constr. Corp. v. WMATA*, the plaintiff sued WMATA for fraudulent and negligent misrepresentations in failing to disclose known risks about a project in the bidding process that posed an increased cost to plaintiff as the contractor of the project. 321 F.3d 1151 (D.C. Cir. 2003). In responding to WMATA's sovereign immunity claim, plaintiff could not point to a specific statute, regulation, or policy that specifically prescribed the information that WMATA was required to disclose in the bid for the project. *Id.* at 1160. However, plaintiff argued that the "general obligation to abide by the covenant of good faith and fair dealing" as proscribed by common law contract cases, provided the "specifically proscribed" policy. *Id.* The court in *KiSKA* explained that "although the covenant of good faith and fair dealing undoubtedly constrains WMATA's behavior within the context of its contractual relationships, KiSKA's misrepresentation claims sound in tort, not contract," and concluded, "the covenant of good faith and fair dealing is not the kind of specific dictate that renders WMATA's acts merely ministerial." *Id.* at 1160.

The plaintiff also argued that a Federal Transit Administration circular, which stated that all "contract solicitations must 'incorporate a clear and accurate description of the technical requirements for the material, product, or service to be procured'" provided the mandatory course of action for WMATA employees to follow in making appropriate disclosures in project bids. However, the court clarified that in order for a regulation to constrain discretion, it must "specifically prescribe[] a course of action for an employee to follow' such that the employee has

no rightful option but to adhere to the directive." *Id.* Accordingly, the court held that "an administrative ukase that mandates only clarity and accuracy" is insufficient to establish a "specifically prescribed" course of action to restrain WMATA's discretion. *Id.* (citation omitted). In finding that WMATA's decision to withhold disclosure of material that potentially created an increased cost to the project, the court find that such a decision required WMATA to consider "budgetary constraints and economic expediency" and WMATA had to "exercise its policy judgment to balance the goal of fair disclosure against the sensible withholding of unreliable information." *Id.* at 1161-62.

In a similar case, a developer seeking to purchase a Bus Garage owned by WMATA and located at the site for the new baseball stadium in the District of Columbia sued WMATA for fraud and breach of fiduciary duty arising from WMATA's alleged representations that it would exclusively negotiate with the developer for the sale of the Bus Garage after WMATA sold the property to another developer. *Monument Realty LLC v. WMATA*, 535 F. Supp. 2d 60, 78 (D.D.C. 2008). The developer argued that the parties agreement "itself specifically prescribe[d] WMATA's conduct" and that the Compact provided the applicable mandatory course of action. *Id.* However, the court held that "an agreement is not the equivalent of a statute, regulation, or policy," and explained that the developer had not cited any provision of the Compact that "specifically prescribed WMATA's course of conduct while engaging in negotiations for the sale of real estate." *Id.* Moreover, the court found that WMATA retained discretion concerning the contents of the PPM, which establish the guidelines for WMATA's sale of real property. *Id.* at 78-79. Finally, the court concluded that WMATA's decision to sale to another bidder was an exercise of discretion with social, economic, or political goals as demonstrated by WMATA's consideration of "the costs of acquiring a new site, the costs of relocation, the costs of changes in

the transportation system to accommodate the move, and assessing the interests and concerns of residents and businesses in the areas" for the new location. *Id.* at 79.

Plaintiff's arguments in opposition to WMATA's sovereign immunity to its tort claims are very similar to arguments raised by the plaintiffs in *KiSKA* and *Monument*, which the Court finds are unavailing. Plaintiff first argues that the Section 12 of the Compact, which gives WMATA authority to adopt regulations for the sale of its real property and is embodied in the PPM, makes WMATA's actions ministerial, not discretionary. Specifically, Plaintiff argues that the PPM requires the WMATA Contract Officer to administer the terms of the agreements for the sale of real property and the Board's approval of the JDA, or the contract at issue, sets forth the terms that the Contracting Officer is obligated to administer. In other words, Plaintiff argues that the contract itself establishes the mandatory regulation or policy that WMATA is required to follow. Plaintiff points to language in section 20.02 of the JDA, which provides that approval of the assignment of the Greenbelt Project contract must not be "unreasonably withheld" as the specifically prescribed course of action that WMATA is required to follow. However, as held in *Monument*, the agreement between the parties is not equivalent to a statute, regulation, or policy that makes WMATA's act of withholding approval for the assignment of the contract ministerial. Moreover, under the holding of *KiSKA*, the general duty of good faith and fair dealing does not establish a "specifically prescribed" course of action for WMATA to follow to support Plaintiff's tort claims, although it is relevant to Plaintiff's contract claim. Accordingly, the Court finds that WMATA's decision of whether to approve the assignment of the Greenbelt Project contract to Greenbelt Ventures is a discretionary, not ministerial, act.

Plaintiff argues that WMATA's withholding of consent is not grounded on social, economic, and policy considerations because it violates the JDA's requirement that approval

11

must not be unreasonably withheld is not sufficient to overcome WMATA's stated rationale for its decision. WMATA represents that the project will change the landscape of the Greenbelt, Maryland area, involves the "interests of many stakeholders and governments, representing millions of dollars and tens of thousands of people with a stake in transit oriented development" who will be affected by the design elements of the plan, and that WMATA must weigh all of these social and economic considerations in the selection of the developer who will be responsible for completing the Project. Moreover, WMATA represents that Greenbelt Ventures, as the purported new developer, was seeking an extension of time of an already long stalled project and that it acted within its discretion to "determine the circumstances under which it would authorize" the change of a new developer. (Doc. No. 22, 5). Accordingly, the Court finds that WMATA's sovereign immunity bars the Plaintiff's tort claims because they are based on discretionary acts of WMATA and are grounded on social, economic, and policy considerations. Finally, given that Plaintiff's tortious interference with contract and tortious interference with prospective advantage, which relate to Plaintiff's Membership Purchase Agreement with Metroland, are based on WMATA's denial of approval of the assignment of the Greenbelt Project contract, the Court finds these two tort claims are also barred by sovereign immunity for the reasons outlined above.[3]

### B. Quasi-Contract Claims – Promissory Estoppel and Unjust Enrichment

As recognized by several courts, promissory estoppel and unjust enrichment are "quasi-contractual claim[s], which [are] equitable remed[ies] that permit[] recovery where, in fact, there is no contract, but where circumstances are such that justice warrants a recovery as though there had been a promise." *See Odyssey Travel Ctr., Inc. v. RO Cruises, Inc.*, 262 F. Supp. 2d 618,

---

[3] Given the Court's dismissal of the tort claims in this case, Defendant's request to strike Plaintiff's request for punitive damages and attorney's fees is now moot.

626 (D. Md. 2003). Plaintiff argues that the dicta in *Huffman v. Town of La Plata*, in which this Court stated that "it is doubtful that any doctrine of governmental immunity from tort liability would serve to bar Plaintiff's promissory estoppel claim" supports its position that sovereign immunity does not bar its quasi-contract claims. No. Civ. A. DKC-2004-2833, 2005 WL 1038854, at *8 n.7 (May 4, 2005). However, as held in *Martin v. WMATA*, a waiver of an entities sovereign immunity "must be clear and unequivocal" and courts must strictly construe whether an entity has waived its immunity in favor of the sovereign so as not to enlarge the waiver beyond what the language of the Compact permits. 273 F. Supp. 2d 114, 119 (D.D.C. 2003) (citing *Kingston Constructors, Inc. v. WMATA*, 860 F. Supp. 886, 888-89 (1994)). The court in *Martin* explained, "section 80's waiver only denotes WMATA's liability for its contracts and torts occurring in the performance of a non-governmental function; it does not mention promissory estoppel, which is a distinct legal theory." 273 F. Supp. 2d at 119. Thus, the court held that "WMATA is immune from [the plaintiff's] promissory estoppel claim" because "the Compact does not expressly waive WMATA's sovereign immunity for that particular cause of action." *Id.* As Plaintiff has not cited any authority demonstrating that WMATA has expressly waived its sovereign immunity for any quasi-contractual claims, this Court finds WMATA is entitled to sovereign immunity as to the Plaintiff's claims of unjust enrichment and promissory estoppel.

## II. Breach of Contract Claim

WMATA conceded in its reply brief, that it is not entitled to sovereign immunity as to the Plaintiff's breach of contract claim. Nevertheless, WMATA argues that the Court must dismiss the breach of contract claim because it is now moot, violates the Statute of Frauds, fails to establish the elements of an enforceable contract between WMATA and Greenbelt Ventures, and is barred by the statute of limitations. Plaintiff asserts two theories to support its breach of

13

contract claim. First, Plaintiff argues that it is a third party beneficiary of the written contract between Metroland and WMATA, which WMATA has breached by unreasonably withholding approval of an assignment of the Greenbelt Project to Plaintiff in contravention of section 20.02 of the JDA. Plaintiff also argues that a contract exists directly between it and WMATA because of WMATA's representations that it had approved the assignment of the Project to Greenbelt Ventures and because the parties negotiated and finally reached a Restated JDA under which Greenbelt Ventures would become the developer of the Project.

Maryland law governs the breach of contract claim in this action because the parties have diversity of citizenship. *See Mercantile-Safe Deposit & Trust Co. v. Chi. Title Ins. Co.*, No. CCB-05-2217, 2007 WL 892103, at *4 (D. Md. Mar. 20, 2007). Under Maryland law, to prevail on a breach of contract claim, a plaintiff must show that the defendant owed plaintiff a contractual obligation and breached that obligation. *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001). In Maryland, a contract "must rest finally upon an offer made by one party and the acceptance thereof by the other party . . . . The offer must be certain and definite, and the acceptance must in every respect meet and correspond with the offer." *Rios v. State*, 974 A.2d 366, 374 (Md. Ct. Spec. App. 2009). Moreover, although generally an individual cannot enforce a contract in which he or she is not a party, Maryland courts recognize an exception for a third party beneficiary. *See Lovell Land, Inc. v. State Highway Admin.*, 952 A.2d 414, 429-30 (Md. Ct. Spec. App. 2008), *rev'd*, 969 A.2d 284 (Md. 2009) (reversing the lower court's resolution of the case but not its statement of the law). "Ordinarily, a third party beneficiary contract arises when two parties enter into an agreement with the intent to confer a direct benefit on a third party, allowing that third party to sue on the contract despite his or her lack of privity." *Id.*

14

(citations omitted). In order to maintain an action for breach of contract, the purported beneficiary must demonstrate that a third party contract exists. As reiterated in *Lovell Land, Inc.*:

> [I]t is generally accepted that before a stranger to a contract can avail himself of the exceptional privilege of suing for a breach thereof, he must at least show that it was intended for his direct benefit. An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee. In order to recover it is essential that the beneficiary shall be the real promisee; *i.e.,* that the promise shall be made to him in fact, though not in form. It is not enough that the contract may operate to his benefit. It must clearly appear that the parties intend to recognize him as the primary party in interest and as privy to the promise.

*Id.* (citing *Mackubin v. Curtiss-Wright Corp.*, 57 A.2d 318 (1948)). The third party beneficiary must demonstrate that the "parties intended to recognize the third party as the primary party in interest and as privy to the promise," making "intent . . . the principal touchstone for determining whether a third party beneficiary contract exists." *Id.*

As Defendant points out, Plaintiff is not privy to the contract between Metroland and WMATA for the purchase of real property at the Greenbelt Metrorail Station. Even in reviewing the facts alleged in the Plaintiff's Complaint in the light most favorable to Plaintiff, the Court cannot find that the Metroland/WMATA contract establishes a third party beneficiary contract. Accepting as true the Plaintiff's factual allegations, Metroland and WMATA entered into their contract on December 21, 2000; however, the Complaint does not provide factual support that Metroland and WMATA entered into this contract with the intent that Greenbelt Ventures benefit from their agreement. Instead, the factual assertions indicate that Greenbelt Ventures did not become involved with the Project until a few years after the Metroland/WMATA contract and Metroland and Greenbelt Ventures did not enter into a preliminary agreement to transfer 100% of the interest in Metroland to Greenbelt Ventures, thereby necessitating the substitution of Greenbelt Ventures as the developer for the Greenbelt Project, until late 2005. Accordingly, the

Court is not convinced that Greenbelt Ventures was an intended third party beneficiary of the WMATA/Metroland contract to enable Greenbelt Ventures to enforce the obligations of that particular contract. Thus, any breach of contract claim must be based on the existence of a direct contractual relationship between Greenbelt Ventures and WMATA.

Plaintiff points to WMATA's alleged representations from March 2006 to September 2006 in which WMATA indicated that it had approved the assignment of the Greenbelt Project contract to Plaintiff as evidence of a direct contractual relationship between itself and WMATA. In addition, Plaintiff alleges that it and WMATA entered into a Restated JDA in June 2008, along with Metroland, which effectively assigned the Metroland/WMATA agreement to Plaintiff as further evidence of the existence of a contract between Plaintiff and WMATA. In the alternative, Plaintiff asserts that even if the Court does not find an express contract between the parties, the parties' conduct of treating Greenbelt Ventures as if it were the Master Developer and entering into negotiations for a Restated JDA establishes an implied-in-fact contract. As Plaintiff highlights, Maryland law recognizes that the only difference between an express and implied-in-fact contract is that an express contract is established by words while an implied contract is established by conduct. *Thomas v. Capital Med. Mgmt. Assocs., LLC*, 985 A.2d 51, 63 (Md. Ct. Spec. App. 2009). Defendant counters that these alleged actions by the parties do not demonstrate that they entered into an enforceable contract because Plaintiff's Complaint indicates that the parties had not reached an agreement on the material terms of the agreement, namely the price, and thus there was no "meeting of the minds." Plaintiff alleges, however, that the Restated JDA contains a fixed price, as well as provides definite and clear material terms of their agreement, thereby defeating Defendant's argument. In addition, Defendant argues that its contract with Metroland required that any approval of the assignment of the Project be in writing,

which it never gave. However, Defendant does not explain why the requirement of written approval pursuant to its agreement with another party negates the establishment of a contract between itself and the Plaintiff to convince the Court to grant its Motion to Dismiss on this ground.[4]

The Court is equally not convinced by Defendant's other grounds for dismissal of the breach of contract claim. The Defendant argues that the breach of contract claim is moot based on Metroland's purported termination of the Membership Purchase Agreement between Metroland and Greenbelt Ventures. However, Plaintiff argues that there is a dispute concerning whether the letter sent by Metroland constitutes as a valid termination of the Membership Purchase Agreement between them, and thus it is inappropriate for the Court to find that the Plaintiff's contract claim against WMATA is moot based on that letter. In deciding whether to grant a motion to dismiss, the Court acknowledges that it should not resolve factual disputes at this stage in the litigation. Thus, Defendant's argument that the contract is moot does not warrant dismissal of the breach of contract claim.

Next, Defendant contends the Statue of Frauds bars the breach of contract claim because contracts for the sale of land must be in writing pursuant to Maryland law. Md. Code. Ann., Real Prop. § 5-104 (West 2010). Plaintiff argues that the doctrines of equitable estoppel (also called promissory estoppel) and part performance prevent Defendant from asserting the Statute of Frauds defense. Under Maryland law, "to establish promissory estoppel, and thus remove the case from the statute of frauds, the plaintiff must demonstrate":

> 1. a clear and definite promise; 2. where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee; 3. which does induce actual and reasonable action or

---

[4] To the extent that Defendant intended to assert a condition precedent defense, the Court finds that it has not established that it is entitled to the defense in its briefings.

17

> forbearance by the promisee; and 4. causes a detriment which can only be avoided by the enforcement of the promise.

*Plana v. Shoresales, LLC*, No. Civ. JFM-03-1227, 2003 WL 21803290, at *4 (D. Md. July 14, 2003). Furthermore, as explained in *Plana*, "the doctrine of part performance is premised upon the notion that to allow a party to escape his performance of an oral agreement after he has permitted the plaintiff to perform in reliance on both the agreement and the defendant's inducements would effect a fraud upon the plaintiff." *Id.* at *5. The court further noted, "part performance is not a substitute for the writing required by the Statute but rather, it may be viewed as a means to estop the defendant from asserting the Statute as a defense. *Id.* In determining whether a party has established part performance, it is not sufficient for a party to simply demonstrate the same facts that give rise to the creation of the contract; instead, the part performance "must furnish evidence of the identity of the contract." *Id.*

Plaintiff alleges that WMATA made representations as early as 2006 that it had approved the assignment of the Greenbelt Project contract to Plaintiff to induce Plaintiff to expend its money and resources in continuing with the development of the Project. Plaintiff contends that in reliance on WMATA's representations, Plaintiff executed a Membership Purchase Agreement with Metroland and continued to make plans for the Greenbelt Project. Lastly, Plaintiff asserts that it spent "$4,500,000 in furtherance of its agreement with WMATA", including making improvements that added value to WMATA property and to satisfy the requirements of the JDA and Restated JDA, which it alleges can only be avoided by enforcement of the promise and demonstrates that it at least partially performed its obligations under the alleged agreement. (Doc. No. 21, 24.) The Court is satisfied that Plaintiff has sufficiently pled facts to establish exceptions to Defendant's Statute of Frauds defense to survive the Motion to Dismiss.

Lastly, Defendant argues that the contract claim is barred by Maryland's three-year statute of limitations because it interprets Plaintiff's Complaint as alleging that WMATA breached the contract in September 2006. However, the Court disagrees and finds that Plaintiff has alleged that its breach of contract claim arose when Defendant refused to put the Restated JDA on WMATA's Board meeting agenda for approval after WMATA took the proposal off the agenda for the September 25, 2008, meeting. Accordingly, the Court finds that Plaintiff has sufficiently pled a breach of contract claim to survive the Defendant's Motion to Dismiss.

## **CONCLUSION**

For the reasons articulated above, the Defendant's Motion to Dismiss (Doc. No. 18) is GRANTED as to the tort and quasi-contract claims and DENIED as to the breach of contract claim. A separate Order shall follow this Memorandum Opinion.

|    August 31, 2010    | /s/ |
|---|---|
| Date | Alexander Williams, Jr.<br>United States District Judge |